We'll go ahead and just move to the first case set for argument, which is Vepo Design Corporation v. American Economy Insurance Company, and that's case number 23-55634. Ms. Arkin. Good morning. Please proceed. Please support. Sharon Arkin for Plaintiff and Appellants. The – as massive as the record here is, the issues are actually fairly simple. Right. And the – oh, and I'd like to reserve five minutes. Sure. I'm sorry. Was there a policy? Yes, there was a policy in effect. Did the policy cover business interruption? It did. Did Vepo suffer a loss? It did. The question here is really whether or not Vepo can prove the value of its loss. The problem with the grant of summary judgment in this case is that the calculation of what the business interruption loss was. Can I just – maybe this would help focus. I had a question on the business income, because as I looked – I mean, I'm a little bit troubled by the district court said that was too speculative and so you can't get it. I'm not sure that that holds up, giving everything else. I mean, Vepo was clearly trying to do this. But there were some uncertainties, and I just want to be clear that before – at the time that the building burned down, they had not yet gone – they were still in discussions about, hey, this is what we want to do. They hadn't actually started operating any.  But they – so can you fill in the gap on the timing there? How quickly was it after that that they started operating some of these businesses? Well, they had been operating this kind of business since 2009. But when you say operating this kind of business, meaning selling them immediately. Right, but also operating them after the sales. Oh, they had already been – oh, I thought they had not yet. But here weren't they going to operate it prior to the sale? So it was going to be somewhat of an adjustment of the business model? There was one time that they operated it before they sold it for a short period of time. I think the record shows 35 different occasions. They built the laundromat. I see, and then they were contracted after. Yes, because the people who bought them, it was an investment. They didn't really want to operate a laundromat. So Vepo would operate the laundromat for a year or two after it was completed and sold, and then the new buyer would resell it. But is it right to say that the timing of this case kind of nestles in a period of change for Vepo in terms of its business model? Okay, so that seems to be kind of the hitch in the case is, you know, well, Vepo was kind of migrating to a model where it was going to run these for a few years or a year or two and then sell them, and this kind of falls timing-wise in that transition. It does, and they hadn't done that exact thing before where they operated and sold, made the second sale for their own interest. They had done everything else. So the other thing that's interesting about this is, and I'm trying to kind of narrow in on where we agree and what we're trying to decide here, but as I understand it, the real question is, could they get their financing paid off? Because I think everybody agrees that if they couldn't get the financing paid off to Alliance, if I remember right, then they could not operate it. So their whole business plan was contingent upon them paying off Alliance and getting finance from somebody else. So that does seem like that was something up in the air. Well, the thing to keep in mind is, although they owed a total of $6 million to Alliance, they only owed $875,000 on that location. And is it clear, I guess we'll ask opposing counsel, but is it clear that at least now it seems there was some dispute initially, but now everybody agrees that as long as they could have paid off the $875,000, they could have run this one? Correct. And that's what they did in subsequent cases, correct? Yes, they did. Were there instances where they tried to do that and they were not successful? Not that I'm aware of. I don't think the record shows that. You mean after this incident when they went on? Right. I mean, look, financing is always a tough deal, and it could be very speculative. I don't know a lot about this. It sounds like it was done. But one of the things was they had to get a business occupancy certificate. Right, right. I didn't see a lot of discussion in the record on that. Maybe it doesn't matter because those might just come fairly automatic. But, like, how long later would they have gotten a… Well, okay, this is the way it operates. The ORL owned the property and had a loan on the property. VEPO had a loan, a construction loan, to build the laundromat. Typically in those situations, once you have your certificate of occupancy or you're in the process of, you know, you're close to getting that, you go out and get financing to pay off the mortgage. And the construction loan. Right. And then that's the loan that you have on your property. So how long would it normally take to get a certificate of occupancy? Well, she had, okay, they started in June of 2015, and they anticipated having the certificate of occupancy in January of 2016. I see. So there's really no dispute that that wouldn't have pushed it outside of the one-year limitations.  So really the certificate of occupancy doesn't matter for purposes of what we're trying to do. What the district court seemed to be concerned about was the financing wasn't yet lined up. And so how do you respond on that? Well, they had a history of financing, but through other means. And they've been financing all along these properties. So I don't understand why the expectation is that. . . Can you explain what that means, they had financing through other means? What does that mean? Well, in the reply evidence, if that's going to be considered, there were declarations from the loan broker and a lending person confirming that there would have been a loan on that property. Do you need those declarations to win on appeal? Because the district court was concerned about the timing there on those. I understand. And no, I don't think we do. Because Ms. Kurian herself talked about how they had gotten other loans. The trial court didn't strike her supplemental declaration. And in both her original declaration and her supplemental declaration, she confirmed that they had frequently obtained financing for their projects. It wasn't like they were deadbeats and nobody was going to loan them money. But they had a track record. Exactly, thank you. But help me a little bit with the timing. You said June of 2018 was when the arson occurred. No, 2017. I'm sorry, of 2017? It was July. But they didn't. . . No, wait. Assuming no arson.  I'm sorry. It was July. It was July of 2015 that the arson was. They started in June of 2015 on the project.  And they expected that they would complete the project and open the laundromat the following January. Correct. So we're talking about roughly six or seven months. Right. And is there any dispute that under the language of policy, business interruption insurance runs from the date of the arson? So if the policy only covered 12 months, it only would have covered about maybe four or five months. I think they calculated 5.7 months. If you'll see in some of the declarations. But that's already figured in and that's a damages issue, not a liability issue. Correct, correct. Okay. Yeah. So if you don't have any other questions, I'll reserve my time. Sure. Okay. Okay, thank you. Good morning. Scott Svezloski for the Appellee American Economy. Parties have thoroughly briefed these issues. It is a pretty voluminous record. So I'm here to answer any questions that the panel may have regarding our position or any comments made by counsel. I'm a little bit concerned about the district court's finding that this was speculative because, I mean, it's a weird case because there doesn't look like prior to the arson there was a lot of examples where they had gotten. It seems like this all turns on financing to me because if they could have gotten the financing, like if they had a letter in hand that said you've got financing, wouldn't you agree that it wouldn't have been speculative that they could have been operating this as a business? That would take care of step one maybe. There's actually two steps here. The first step is in order to have a loss of business income, you have to have a business. It wasn't their business. They had thought about it, but remember their business model before was they were a spec developer. They built and sold. No, I understand that. Right. But they clearly were talking about moving this way, and they did move this way. Maybe you can help us out on the timing on that. I mean, it wasn't like it was two years later that they started operating this before selling them. This was, I mean, there's at least evidence that suggests this was all in the process. It's not inconceivable that they would have done it with this one. It was brand new. It was where, and the principle. This would have been the first one. They had not done it previously at all? There's reference to having done it for a short period of time earlier. We don't know the term, how long. We don't know if it was profitable. We don't know the details. We just know from Ms. Kushkarian's declaration she said that we did it for a short period of time. But then they did go on to do it? Years later. Yes, somewhat later. How many years later? My recollection was it was, the evidence they pointed to I believe is five years later. So they never actually put this into effect until five years later? Well, that's the, I believe it was three to five years later is my memory of the exact time period. That's what they've pointed to. And they pointed to their ability to get refinancing for those projects at higher rates that are personally guaranteed. So that doesn't mean that five years earlier they could have received favorable financing in order to refinance this, pay off the loans. And actually make an income. Exactly. That's the key issue. So that's step one. But doesn't that go to damages more than it goes to liability? Because, I mean, it seems like there's a genuine issue of fact about whether they could have operated at this time. Your argument, you can make these arguments to a jury and say, look, they couldn't have gotten this, and you may well be right. But I don't know why that cuts it off at the head to say you can't actually move forward at all. So my question then is, where's the evidence? Because that's what the jury – The declaration. The declaration. So she's going to get up on the stand and testify to this. You're going to cross-examine her and say, yeah, but you guys didn't do this for five years. Why are you telling it? Why are you trying to fake out everybody and say that you were going to do this five years earlier? I understand the question, Your Honor, and if I may, it's because they don't have evidence. They have her belief. She said, I know I could have got financing. Okay. Which lender? What terms? Were you in negotiations? In your deposition, you admitted that, well, that was too early. We didn't do anything. It was too early to even consider it. But now you're saying, well, I believe I could have done it. That's not evidence. And the jury is there to judge evidence, not her beliefs. So let me posit it this way.  Go ahead. If the fire had happened today, it would be a different case, right? Because they now have a track record of having done this. Is that the difference in these cases? I'm not sure because, in fact, I would say no because they still have to show that they would have been able to get the refinancing. And that's the big part. Right, but they've already – but if it happened today, I mean, your argument now is you'd never done refinancing. You actually didn't do that until five years later. So we can't reconstruct five years prior what would have happened. But today they'd be able to come in and say, we've done this for five years now. And, you know, they can say nine times out of ten or seven times out of ten, we're able to do this successfully. So wouldn't – would you agree that if the fire happened today that the district court probably would have gotten it wrong if he'd said this was speculative? Under that hypothetical, it's a little hard to say. I would still say no. And that's just – and that's because – just because you were able to get refinancing for other projects at other times. Doesn't address this one itself. That's correct because it's still – it's like, well, okay, we're now, let's say, a year later. What are the rates? Why do you say you could get the financing? What if you didn't have enough capital? What if you couldn't secure it? Do you have to personally guarantee it? Is the rate going to be higher? Is it going to be lower? Like, there's no evidence of any of that. And that's a big problem to even get – before you even get to step two, like would this have been profitable, there's no evidence that they've run a profitable enterprise prior to this time. No evidence of that. But that's step two. Step one is you have to have a business in the first place. This was a new venture for them. And what is the limiting factor and what the district court really focused in on is, well, there's no evidence other than your belief that you could have refinanced this, paid off your loan, and actually operated the business. Well, except the problem is, going back to my track record observation, we're not dealing with an entity that has no experience in this business. I mean, they've been doing this for a lot of years. The only difference is they would flip the project as soon as the laundromat was completed and sell it. And as I understand it, what they wanted to do in changing the model was to try and establish through an income stream justification for a higher price for the sale of the business. So I think it is relevant that they were able to complete all these prior projects and get refinancing to take out construction loans. I hear what you're saying about higher interest rates and speculation, but I have the sneaking feeling that we've got some material issues of fact here that a jury is going to have to work out. So I would ask this, Your Honor. If we were to panel a jury today, what are the tribal issues of material fact? What's the evidence? Not beliefs, but what's the evidence that they're going to be looking at and deciding what they had been able to do in the past in terms of obtaining takeout financing and I'm assuming didn't they have an accountant who ran some projections? And I'm not sure what the evidence was to support those projections, but as I understand it, there was some testimony with regard to anticipated stream of income once the laundromat was up and running. That was a consultant that they retained after the loss, years after the loss, to come up with some projections. So that was not presented to the district court? That is in the record, but it was based on a pro forma analysis, what we believe may or may not have happened back at the time. Okay, but that sounds to me like an issue that you cross-examine them on and try and convince the jury that it's not competent evidence to support his opinion as to what the final numbers are. Why isn't that a material issue of fact that's in dispute? That's step two. Right. So that's step two. So we have to first get past step one, which the district court focused on. The district court was focused on there's no evidence, actual evidence, facts that show that you could have actually owned this business. That's the issue. Before we even get to profits. But why isn't it relevant that they'd done it in the past, that they'd successfully completed, I don't know, two dozen of these projects and flipped them? I would say that there's a big difference between flipping a property and managing it, running it, operating it, and operating it profitably. We know of only one instance five years earlier where they'd run it for some short period of time. And we don't know any of the details. Did they do it profitably? I mean, that's the kids. That wasn't the subject of discovery. There's no evidence in the record as to the details surrounding that. That's correct, Your Honor. And that reminds me, actually, that the Kids Universe case, one of the cases we cited to where the court there looked at the facts and said, look, you have experience as a retailer. You have experience at running a website. But you haven't shown that you've done it profitably. And it's all basically you're saying, well, this flood means you couldn't have had this wildly successful website. Well, you haven't shown any kind of track record for this specific project, for this specific website. And so we're going to exercise our gatekeeping function and say, this is speculative. This is not actually evidence. There's no evidence for a jury to actually consider. It's just a belief. The problem I have with your argument, and maybe this is the answer, but it sort of suggests that anybody starting out in a new business would never be able to get past summary judgment in one of these cases. And it strikes me that there's a lot of facts. I mean, if Facebook had been stymied right out of the get-go, I mean, would you say, well, you never actually operated profitably? Well, now it is. I mean, I understand that it's speculative. I don't know what the numbers are, but it seems like it's a genuine issue of material fact as to how likely it was that this was going to be profitable. And there's at least subsequent evidence that suggests they were willing to do it. Your argument seems to hinge on the fact, in some ways, that, well, we don't believe you were actually ready to do this because you actually didn't. You're saying you were ready to pull the trigger, if you will, on this transition, but you really didn't do that for five years. Yeah, and I want to be careful. I'm not making a credibility call. It's not a credibility determination. I really am trying to focus just on the evidence, like what was before the court at that time. And the courts do address this established versus unestablished business. There is a difference. And the courts say, admittedly, look, it's very hard, if you're an unestablished business, to actually show the lost income stream. It's very difficult. Not impossible, but it is very difficult. And so we're going to want more than, well, I believe I could have been successful. It's like we actually want evidence. It feels like they do have more here because they actually ended up doing it. You know, they were in the business. I mean, your example is a good one of, hey, it was a website, and they were going to expand their website. So there, theoretically, there is some analogy there. Can I ask you, Mr. Spasso, there's a couple other. All we've really been talking about is the business income claim, which I think is valued at around $700,000 plus some interest on top of that. So we're under a million, I think. Maybe it's gone up since. But there is another claim for lost profits from the sale, which we didn't hear anything from the plaintiffs on. And there seems to be a timing issue on that piece of it. Can you just walk through that?  And this is something that they didn't address in the opening brief, which is on the basis of the court's determination, that this lost profit claim that you're asserting falls outside the 12-month period, falls outside the 12-month limitation that's provided in the policy. So the point is, you would not have been earning any profits. And under your timeline, it would have been 18 months before you could have sold the property for a profit. So that 18-month period, which starts from the date of the fire, falls outside the 12-month limitation. And so our argument, and the district court agreed, is, well, that's outside the policy. And there was no circumstance where they could have sold that within a year. It's a little bit ironic, because it seems like in this, you could either get business income or the sale. If they had just built it and sold it, would that not have happened within a year? Well, there has to be some sort of event that causes a loss. Well, so as I understand it, when the fire happened, they get to recover damages for a year after that. That's correct. And if they had, does that mean they would have had to rebuild it and sell it within a year of the date of the fire? Oh, I see your question. Yes, yes, that's correct, Your Honor. It would have been, if they were going to take advantage of that provision of the policy and try to recover on it. But they couldn't do that. The evidence is that it would have taken more than a year to rebuild it. By their own admission. By their own admission, it was an 18-month, 18 months. 18 months of what? From the date of the loss. But 18 months of doing what? Of running it before selling it? Well, that's their argument. They said, okay, well, we needed this period of time to, so what we, I understand the question. So let's say they would have opened up in January. Under their theory, they would have, they're saying, well, we would have operated it for a year and then sold it and made, you know, and be wildly profitable. So they're adding additional year of operation. Right, I mean, they need that as part of their, that is part of their theory, is that we would have added value to this and that then pushes the date of some eventual sale later. Past, past the. But here's the interesting thing. If they had just said, no, we weren't going to operate it as a business, we were just going to sell it, they could have sold it within six or seven months. If that was their theory, yes. So they baked their theory in and, I mean, and then you wouldn't have speculative arguments, it seems to me, on the sale because they have a track record of that. Of selling? That's right. I mean, because that's their business model. Yeah, I mean, yeah. I'm sorry. Do you even concede that the sale of the business is a covered damage, essentially? Like the lost profits from the sale of the laundromat would even be something that your client would cover under the policy? Because I understand the business income, but that's a little maybe different than just selling the business. Right. Potentially. Potentially. And that if this had occurred during the one-year limitation within the policy, it'd be a different conversation. We'd be having a different conversation than we're having right now. When did the laundromat actually open or was it ever finished? It was finished December. It was December. I can't recall the exact date offhand. I apologize. But you mean December, like four months, five months later? No. Or a year and a half later.  Yeah, it was more than a year and a half. And it wasn't finished until then. Correct. So that would have been more than 12 months after the fire. Yeah, they couldn't have even gotten an operating loss. That's right. I see I'm almost out of time. I am happy to answer more questions. No, that was helpful. Okay. Yeah, I appreciate the time. And just to sum up, the district court really was focused on step one, in my view, which is, could you have even owned this business in the first place? And that's where the evidence was lacking. It was nothing more than a declaration which said, I believe I could have gotten refinancing on the loan. No actual evidence that they could have, that there was a lender in place, terms, contract, anything. And of the cases that we've cited, which are the most on point between the parties briefing, the courts there have found, look, this is speculation, and we're not going to allow this to go to a jury and instead grant summary judgment. So with that, Your Honors, I submit on the briefing. Thank you. Thank you. Okay. A couple of things. They finally finished the central laundry in December of 2017. But that doesn't matter. The point is the fire is what prevented them from finishing the laundry. But the policy clock is triggered by the date of the fire, is it not? And so the insurer is only on the hook for the period 12 months from the date of the loss. Yes. So if they don't finish the central laundromat, central laundry, until December of 2017, that's beyond the 12-month period. You can't use that because the fire prevented them from doing it. Well, yeah, but the policy language says that coverage – Well, there has to be some limit. Your argument is we would have had this done within a year, so we get – But I don't know how that works out because the fire – I mean, I guess it takes longer to rebuild after a fire than just the retrofitting. Oh, yeah. Just to clarify, are we talking now about the sale, the possible sale of the business, or are we talking about the business income generated prior to the sale? I'm talking about both, really. But clearly the income generation part of it falls within the year because it would have opened in January of 2016, and they would have had – so they lost income. You have to go as if the fire never happened. Yeah, so here's my question to you because it's interesting. You elected – and maybe it's because the damages amount are a lot higher, but you elected a speculative income stream that had never been proven where you do have a track record of selling it. And if you said, hey, we would have had this built in January, we would have had it sold, then it would have been within the 12-month period. But they operated these laundry – they successfully operated laundry. That's not my question. Okay. My question is you could only get one or the other here. It seems to me you can either get business income because we're going to operate this or we can get the sale. You can't get both because if you're going to claim the business income, then the sale is going to happen after a year.  Why did you elect a speculative theory of damages? Why didn't you just come in and say, you know what, we were just going to sell it? I think you'd be – if you said we were just going to sell it and we want – then you wouldn't have a restriction on the 12-month period because you would have been within it and you would have had a track record. Now you've sort of deep-sixed potentially both. So I'm just interested in why – and the answer may be simple because the business income losses were so much higher at $700,000. Well, the business income losses were pretty concrete, and they weren't speculative because their own expert said that they would have made $14,000 a month. Their expert report said that. So those damages are not speculative. What would we look to, though, for the cost? That's gross income, correct? No. $14,000 a month. No. That was the net income. And that was taking into account current interest rates and all that other stuff. Right. But that's interesting because that assumes – What is that, current interest rates? Now we're back to the track record problem. How do you know that it's $14,000 a month income when you didn't operate the business? If you look at – Where is this? I didn't see this expert. It's the Larson Declaration. It's starting at 1801 in the record. Page 1801. It's Volume 8. And he goes through and he has a whole calculation for what the potential interest rate would be on the loan given the circumstances right there. But I'm wondering if that's not just – I mean, you still have the question of whether you could have gotten the financing. I mean, I haven't read it, but I'm assuming that if I go in and read Larson's declaration, he's going to say, well, I'm assuming that you could have gotten the loan. So this was like a damages expert that they had. Right. I don't know that you can say that that gets you past the speculation. No, on the loan issue, I understand. But she did not testify to her belief. She testified that we've been doing this for years. We've been getting loans for years.  They had been doing financing on other projects, not necessarily the laundromats. They had a large business. They got lots of loans for lots of things. If you read her declaration, she lays it out that she's basically an expert, and she's giving an expert opinion. Why did she say we would have gotten here? And I guess the answer is because that time period hadn't come yet because they were waiting for a certificate of occupancy. Right, exactly. But, gosh, it just seems like you would come in and say, hey, here's a lender, which maybe that's what you have in the supplemental.  There is. And the point is they just started this project in June, and it burned in July. They were anticipating having six months to get the loan in place. And given their track record— How many other laundromats were built? Because one of the arguments they say is you actually didn't start operating these businesses before sale until about five years later. No. The other two that she testified to, and this wasn't supplemental. This was in the original declaration. The other two, I think Main Street and Corbin, were in 2017. They got those two— They were operating zones before the sale. Yes. That's what she said. That's in the original declaration. Yes. And the speculation on the loans, they had a history of getting loans. She says that. And you're right. If they want to cross-examine her and say, well, what do you mean? What loans? On what? Where? How? Then the jury gets to decide if that was speculative or not. Is there enough evidence there to do it? And another thing on the lost profits, and I understand what you're saying. My perspective on the lost profits is they lost those profits when the fire happened. So that's within the year. But I understand what you're saying. In any event, even assuming that you can't get that, you can only get the income, the business income, the bad faith is what caused them to not be able to wrap this up within the year. And what did Ms. Larson rely on in order to establish the business income, the lost business? Well, Mr. Larson was their expert. Mr. Larson. I'm sorry? Mr. Larson was their expert. He relied on industry standards, which Sargon Enterprises says you can do for an established business. You can rely on industry records. They had two experts, Ms. Unger and Mr. Larson. They both relied on industry standards, turns per day, which I think of them spinning. And they put that in because assuming that we went to damages, they were giving a much lower amount. They were going to say instead of $700,000, you could only get $180,000. Exactly. So that's a jury issue. If we get to damages. Yeah. But on the lost profits, the bad faith, that's a consequential damage of the bad faith action anyway because their bad faith prevented them from being able to get this done in time. So they lost the ability to do that because they didn't have the money to complete it. And I want to point out that in the record there's also evidence of at least three other laundromats that they built and operated and sold, or they built, sold, and operated for the buyer. So that's pretty strong in the record. But I think the problem that we're grappling with is none of those deal with the financing that's here. And that seems to be what the district court said was the financing was speculative. And, I mean, it's a tough question. Well, I would implore you to go back and read her declaration because she lays it out very carefully about what their business was, how they operated, that they had other loans on other businesses, on other projects, that they were a trustworthy borrower. All right. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: TALLMAN, NELSON, BRESS